```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
```

----------------------------------------------------------------- x

LOIS SACKS,

                      Plaintiff,

           -against-

DEUTSCHE BANK NATIONAL TRUST
COMPANY as Indenture Trustee for American
Home Mortgage Investment Trust 2006-3,
AMERICAN HOME MORTGAGE
CORPORATION, AHM SV, INC., AMERICAN
HOME MORTGAGE SERVICING, INC.,
MERSCORP HOLDINGS, INC., FEDERAL
DEPOSIT INSURANCE CORPORATION, JOHN
DOES 1-10, and OCWEN LOAN SERVICING,
LLC,

                     Defendants.

**MEMORANDUM & ORDER**

2:12-cv-6338 (ENV) (SIL)

----------------------------------------------------------------- x

DEUTSCHE BANK NATIONAL TRUST
COMPANY as Indenture Trustee for American
Home Mortgage Investment Trust 2006-3, and
OCWEN LOAN SERVICING, LLC,

                 Third-Party Plaintiffs,

           -against-

ROBERT SACKS,

               Third-Party Defendant.

----------------------------------------------------------------- x

VITALIANO, D.J.

      Plaintiff Lois Sacks brought this quiet title action against Deutsche Bank National Trust Company ("DBNTC"), naming American Home Mortgage Corporation, AHM SV, American Home Mortgage Servicing, MERSCORP Holdings, the FDIC, and ten John Does as co-defendants. (Compl., ECF No. 1). Ocwen Loan Servicing, LLC ("Ocwen") would later appear

1

as a co-defendant. (*See, e.g.*, Answer, ECF No. 12). The action arises from a note and mortgage on one of Sacks's properties, located at 72 Becky's Path, Bridgehampton, NY 11932 (the "Becky's Path Property"). (Compl. ¶ 1). Sacks seeks a declaration that the note and mortgage are invalid and that defendants have no claim to the property. She also seeks an order (1) cancelling or reforming all records of the note and mortgage and (2) awarding title and final possession of the property to her. (*Id.* ¶¶ 40-42, 45, 52, 58-59). Defendants counterclaimed for breach of contract, account stated, unjust enrichment, equitable mortgage, fraudulent transfer, and declaratory judgment. (Am. Answer, ECF No. 80). As third-party plaintiff, Ocwen impleaded Lois Sacks's son, Robert Sacks,[1] as well as Fidelity National Title Insurance Company ("Fidelity") and Ira Kahn. Ocwen brought claims of breach of contract, fraud, unjust enrichment, indemnification, contribution, and declaratory judgment. (Answer, ECF No. 12). It subsequently voluntarily dismissed its claims against Fidelity and Kahn. (Notice of Voluntary Dismissal, ECF No. 46). On top of these claims, DBNTC brought third-party claims against Robert Sacks and Fidelity. After dismissing its claims against Fidelity, DBNTC still maintains claims of common law fraud and breach of contract against Robert Sacks. (Notice of Voluntary Dismissal, ECF No. 85).

Trial before the Court (Wexler, J.), sitting without a jury, began on August 15, 2017 and concluded the following day. Sacks and DBNTC each submitted proposed findings of fact and conclusions of law. After the case was reassigned, upon the death of Judge Wexler, the parties agreed not to call additional witnesses or to retry the case but, rather, consented to decision resting upon the closed record. (Stipulation, ECF No. 117). Pursuant to Rule 63 of the Federal

---

[1] For ease of reference, because Robert Sacks and his mother are both parties to this lawsuit, he will be referred to as "Robert" and his mother as "Lois."

Rules of Civil Procedure, the Court now certifies that it is familiar with the record and may decide the case without prejudice to the parties. Having considered the testimony, the exhibits received in evidence, and the arguments of counsel, this Memorandum and Order, pursuant to Rule 52 of the Federal Rules of Civil Procedure, constitutes the Court's findings of fact and conclusions of law.

## Findings of Fact

At the time of trial, Lois Sacks was 81 years old. (Tr. at 19).[2] Her husband, Ira, died in 2001. (*Id.*). Lois now lives by herself. (*Id.*). She has three sons: Evan, Kenneth, and Robert. (*Id.*). Education for both Lois and Robert ended with high school graduation, and neither has worked for 30 years. (*Id.* at 20-21). Robert has attention-deficit/hyperactivity disorder and a low IQ. (*Id.* at 20). Notwithstanding her obvious awareness of these conditions, for many years, Lois allowed him check signing power over her accounts. (*Id.* at 45). Separately, she continues to give him $3,000 each month. (*Id.* at 44). Lois made provision for her son even beyond that. When Robert was arrested by federal authorities for a series of fraud crimes, she paid his bail and legal fees. (*Id.* at 42). It was not until January 2006 that she revoked his check signing power. (*Id.* at 33, 84-85).

Lois purchased the Becky's Path Property on July 28, 1998. (Pl.'s Ex. 2). On June 26, 2006, Robert executed a promissory note in the amount of $805,000 and a mortgage on the property, purporting to act as attorney-in-fact for his mother, who is listed as the borrower. (Defs.' Exs. A5, A6). DBNTC is the current holder of the note and mortgage. (Pretrial Stipulation ¶ 3, ECF No. 108). Ocwen is the current servicer of the mortgage. (Tr. at 106-07).

---

[2] References to "Tr." denote references to the trial transcript.

At the closing, Robert presented his driver's license, (Tr. at 159-66), as well as a power of attorney in his favor (the "POA"), dated June 22, 2006, with Lois as the stated principal. (Defs.' Ex. A26). The POA purported to be notarized by Ira Kahn and witnessed by Dennis Medeco and Santos Becker.[3] (*Id.*). By its terms, it authorized Robert to execute a promissory note and a mortgage encumbering the Becky's Path Property. (*Id.*). At trial, Lois denied signing the POA, (Tr. at 70-71), but also denied that Robert forged the POA, (*id.* at 70).

The plot in the tale of Lois's purported signature on the POA would thicken. Lois testified that she suffers from arthritis in her fingers, is ambidextrous, signs different documents with different hands (which is normally penmanship altering), and always varies her signature. (*Id.* at 53-54). At trial, her counsel did not call a handwriting expert, the professed notary, or either of the persons who signed as witnesses to the POA. Detective Bradford Stephenson, formerly of the United States Secret Service and now of the Broward County Sheriff's Office, did testify that, while conducting a mortgage fraud investigation, he learned that Ira Kahn's notary stamp had been stolen and was used on several falsified mortgage documents. (*Id.* at 205). However, in the absence of testimony about how Detective Stephenson learned this or testimony from Kahn himself, the Court is unable to place significant weight on this assertion, much less to find that Kahn's notary stamp had, in fact, been stolen. Therefore, as will be elaborated in the conclusions of law, *infra*, the Court finds that Lois signed the POA running to Robert's favor.

---

[3] It is notable that the name Santos Becker is very similar to the name of Sandy Becher, an attorney connected to Robert Sacks, and if this represents a misspelling of Becher's name, it would strongly suggest that the POA was forged. However, despite presenting selections from Becher's deposition testimony, nothing in that testimony or elsewhere in the record addresses Becher's involvement with the POA or speaks to whether there was or was not a separate person named Santos Becker who witnessed the document.

4

After it was executed but before the closing, the POA received the approval of the originating lender, American Broker's Conduit ("ABC"). (*Id.* at 143:17-23, 149:2-20). The original POA was in possession of the lender's representative, Mary Mark, at the closing. (*Id.* at 143:4-6). Mark followed standard procedures during the closing, providing all relevant documents to Robert Sacks and providing him an explanation of each document. (*Id.* at 148:2-9, 150:2-10). Mark signed the mortgage and the HUD-1 settlement statement, witnessing Robert's signature. (Def.'s Ex. A6, A26: Tr. at 150-152). Robert signed the mortgage, note, HUD-1 settlement statement, and loan application as "Lois Sacks by Robert Sacks her attorney in fact" where a signature was required and initialed "LS by RS" where initials were required. (Tr. at 122:7-24; Pl.'s Ex. 6; Def.'s Exs. A5, A6). The signature affidavit was executed by Robert Sacks in the same manner. (Pl.'s Ex. 9). Lisa Gadzinsky was present at the closing on behalf of a title insurance company that served as the title closer. (Tr. 152:5-9). She notarized Robert's signature on the mortgage as attorney-in-fact for his mother, Lois. (*Id.*; Def.'s Ex. A26). The mortgage was recorded in the Records Office of the Suffolk County Clerk on July 27, 2006. (Def.'s Ex. A6). Pursuant to the terms of the note and the mortgage, payments were due on a monthly basis, starting on October 1, 2006, each in the amount of $2589. (Def.'s Exs. A5, A6). It is uncontested that payments were made from October 2006 through February 2009. (Tr. at 118:7-17).

After the required documents were signed, Mark authorized the transfer of the loan proceeds from ABC to Lois. (*Id.* at 152:11-23, 156:5-159:14). Of the $805,000 total loan proceeds, $756,153 was the amount to be realized by her, after deducting closing costs. (*Id.* at 152:10-23). On June 30, 2006, Mark received a fax from an employee of Juice Wireless, Inc., a startup company in which Robert was involved. (Def's Ex. A22). The fax instructed Mark – at

the direction of Sandy Becher, an attorney who Robert knew and Lois had encountered – to wire $750,000 to the account of Juice Wireless, Inc. (*Id.*). It was a matter of dispute among the parties whether Lois, herself, planned to invest in the startup. In any event, the record establishes that the funds were transferred to Juice Wireless in accordance with this request, and the remaining $6153 was transferred to Becher. (Def.'s Exs. A16, A26).

Moving forward, payments were made on the mortgage loan from October 2006 to February 2009. (Def.'s Ex. A43). With its nonpayment, the loan fell into default on March 1, 2009. (Tr. at 118:7-17). Thereafter, plaintiff has failed to pay the loan balance, interest, late fees, attorney's fees, costs of collection, or any other charges that default triggers perforce of the loan agreement. (*Id.*; Def.'s Ex. A43). Two notices, dated February 17, 2009 and July 22, 2010, were sent to plaintiff, advising her of the default. (Def.'s Ex. A29; Tr. at 121-29). These notices were received by Lidia Mooney, who handled Lois's financial affairs, including her bills and income. (Tr. at 47:17-20, 81:12-13, 86:22-24). Mooney testified that she informed Lois of these notices. (*Id.* at 86:18-20). As of August 9, 2017, the total amount due on the mortgage loan, exclusive of attorney's fees, was $1,216,304.09. (Def.'s Ex. A28).

Conclusions of Law

I. <u>Enforceability of the Mortgage</u>

Although it is true that if a document essential to a valid mortgage has been forged, then the mortgage is unenforceable, *see Jiles v. Archer*, 116 A.D.3d 664, 983 N.Y.S.2d 283 (2d Dep't 2014), plaintiff must first establish that the signature on the POA was forged. "Under New York law, '[w]here a document on its face is properly subscribed and bears the acknowledgement of a notary public, there is a "presumption of due execution, which may be rebutted only upon a showing of clear and convincing evidence to the contrary."'" *Leser v. U.S. Bank Nat'l Ass'n*,

No. 09-cv-2362 (KAM) (MDG), 2012 WL 4472025, at *7 (E.D.N.Y. Sept. 25, 2012) (alteration in original) (quoting *Chianese v. Meier*, 285 A.D.2d 315, 320, 729 N.Y.S.2d 460 (1st Dep't 2001), *aff'd as modified*, 98 N.Y.2d 270, 774 N.E.2d 722, 746 N.Y.S.2d 657 (2002)). Given the strength of this presumption, "[s]omething more than a bald assertion of forgery is required to create an issue of fact contesting the authenticity of a signature." *Beitner v. Becker*, 34 A.D.3d 406, 408, 824 N.Y.S.2d 155 (2d Dep't 2006) (quoting *Banco Popular N. Am. v. Victory Taxi Mgmt.*, 1 N.Y.3d 381, 384, 806 N.E.2d 488, 884 N.Y.S.2d 480 (2004)); *see also HSBC Bank, USA v. Hagerman*, 130 A.D.3d 683, 684, 11 N.Y.S.3d 865 (2d Dep't 2014) (citing *Banco Popular*, 1 N.Y.3d at 384; *Beitner*, 34 A.D.3d at 408). Indeed, New York courts have stressed that to overcome the presumption of due execution, proof of forgery must be "so clear and convincing as to amount to a moral certainty." *Kanterakis v. Minos Realty I, LLC*, 151 A.D.3d 950, 951, 55 N.Y.S.3d 452 (2d Dep't 2017) (quoting *Beshara v. Beshara*, 51 A.D.3d 837, 838, 858 N.Y.S.2d 351 (2d Dep't 2008)).

Against this backdrop so unfriendly to challenge, the primary record evidence offered in support of Lois's claim that her signature was forged is her uncorroborated assertion. Alone, Lois's "say so" falls woefully short of meeting the standard New York law demands because "[t]he unsupported testimony of an interested witness is insufficient to overcome the presumption of due execution," *Osborne v. Zornberg*, 16 A.D.3d 643, 644, 792 N.Y.S.2d 183 (2d Dep't 2005). Plaintiff does protest further that she was living in New York when the POA was executed in Florida. (*See* Tr. at 18). Nonetheless, testimony that a plaintiff was not present when a notarized document was signed is a disavowal of the signature in different words and has been held insufficient to overcome the presumption of due execution, particularly when that testimony is offered by the plaintiff herself. *See, e.g., Son Fong Lum v. Antonelli*, 102 A.D.2d

258, 261, 476 N.Y.S.2d 921 (2d Dep't 1984), *aff'd*, 64 N.Y.2d 1158, 480 N.E.2d 347, 490 N.Y.S.2d 733 (1985).

Plaintiff did also proffer a former Secret Service agent's testimony that Ira Kahn's notary stamp had been stolen, (Tr. at 205), but this testimony, which vaguely referred to what the agent learned during a prior investigation, was mere hearsay and failed to establish that the allegedly stolen stamp was used on the POA. Notably, Lois failed to call Kahn himself as a witness to testify as to whether he notarized her signature, and further failed to call either of the witnesses to the signature. Most significantly, the absence of these witnesses is unexplained. The need to call at least one was critical. Nor was it to be perhaps ameliorated by plaintiff calling and attempting to qualify a handwriting expert who might have been able to opine on any deviations between Lois's signature and the signature on the POA. Setting aside the absence of a handwriting expert, the unexplained, unameliorated absence of the witnesses to the signing, known to plaintiff from the face of the POA, is deafening and powerful. The Court infers, given that plaintiff has made no showing as to their unavailability, that they were not called because their testimony would not have been helpful to plaintiff.

The proof, of course, was not limited to testimony. The trial exhibits included a copy of the POA, (Pl's Ex. 6), and an image of Lois's driver's license, which bears her signature, (Def.'s Ex. A9). The Court's lay comparison of the signatures reveals slight differences between the two signatures. Given the Court's lay experience that the signatures of others known to the Court often vary, the fact that the two purported signatures of plaintiff examined by the Court exhibit differences hardly leads to the conclusion that the signature on the POA is a forgery, particularly in light of Lois's testimony that she is ambidextrous and suffers from arthritis, leading her to sign documents with different hands on different occasions, (Tr. at 53:9-54:3). In fact, referring to

8

her signature, Lois admitted, "Anyway I do it, it's never the same." (*Id.* at 54:3). In these circumstances, especially, a mere comparison of the POA and the driver's license does not produce credible evidence sufficient to overcome the presumption that the POA was duly executed. In sum, with respect to the challenge to Lois's signature on the POA, the mortgage is valid and enforceable because Lois has failed to rebut the presumption that her notarized signature on the POA is authentic.

Ultimately, the signature challenge is the only challenge. Neither party has suggested that the mortgage was defective for any reason other than the alleged forgery of the POA, and neither party has argued that the POA is facially insufficient to grant Robert the power to execute the mortgage. Because plaintiff's sole argument for relief is that the signature on the POA was forged, she has failed to establish her entitlement to the relief she requests. She is not entitled either to the Becky's Path Property free and clear of the mortgage or to a declaration that the note and mortgage are unenforceable.

## II. Counterclaims

DBNTC has interposed a variety of counterclaims arising from the failure of Lois to pay amounts due on the mortgage loan. Specifically, DBNTC brings counterclaims for breach of contract, account stated, unjust enrichment, equitable mortgage, and fraudulent transfer.

Contractual breach, under New York law, requires a showing of "(i) the formation of a contract between the parties; (ii) performance by the [counterclaim] plaintiff; (iii) failure of [counterclaim] defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)). To cut to the chase, in any event, the disposition of plaintiff's claims, perforce, is founded on the existence of a valid contract. Moreover, that we

are here at all rests on the failure of plaintiff, as counterclaim defendant, to make required payments on the contracted loan. (*See* Payment Reconciliation History, Def.'s Ex. A43). That payments were not made, of course, constituted a breach of the loan agreement, (*see* Def.'s Exs. A5, A6), and DBNTC is, therefore, entitled to contract damages. Resultingly, the Court need not consider DBNTC's claim for account stated because any contract damages will include the amounts stated on the various loan statements and notices sent to plaintiff.

As to an award of compensation, DBNTC is entitled to contract damages in the amount of $1,690,703.59. This sum includes the amount due on the mortgage, $1,216,304.09. (Def.'s Ex. A28). The total award also includes attorney's fees, pursuant to a provision of the note that gives DBNTC "the right to be paid back by [plaintiff] for all of its costs and expenses in enforcing this Note . . . includ[ing], for example, reasonable attorneys' fees." (Def.'s Ex. A5 ¶ 7(E)). Also operative is a similar provision in the mortgage. (Def.'s Ex. A6 ¶ 9). Indeed, the parties' "intention to provide counsel fees as damages for a breach of contract . . . is unmistakably clear from the language of the contract," and the Court may, as a consequence, award fees, despite "the accepted policy that parties are responsible for their own attorneys' fees." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) (internal quotation marks omitted). DBNTC has submitted uncontested invoices and affidavits indicating that it has incurred total attorney's fees in the amount of $474,399.50, comprising $195,503.33 in pretrial attorney's fees and $278,896.17 in fees connected to trial and post-trial matters. (Def.'s Ex. J; Aff. of Legal Services, ECF No. 114-1). The Court finds these fees to be reasonable in light of the length and extent of this litigation. Plaintiff has not disputed the enforceability of the fees provision, the amount of fees incurred by DBNTC, or the reasonableness of those fees. Therefore, DBNTC is entitled to contract damages in the amount of $1,690,703.59.

Next, more in the nature of housekeeping, given the existence of a written contract, DBNTC may not prevail on its claims of unjust enrichment and equitable mortgage. In fact, both were pleaded in the alternative, and, given the Court's determination on the breach of contract claim, they are deemed discontinued.

In a similar way, DBNTC's fraudulent transfer claim falters substantively but without practical impact. Under New York law, a conveyance is fraudulent when "made . . . with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." N.Y. Debt. & Cred. Law § 276. DBNTC alleges that Lois transferred the proceeds of the mortgage to Robert, Juice Wireless, and JP Servicing with the intent of not repaying DBNTC's predecessor in interest and claims that this constituted a fraudulent transfer. In support of its allegation, DBNTC invokes evidence it adduced regarding prior mortgage frauds, allegedly involving Lois and Robert. However, the evidence is as consistent with Lois's naively supporting her son in his business activities, which turned out to be fraudulent, as it is with her deliberately participating in the frauds. Moreover, at least one investigation into the prior frauds concluded that Lois was a victim rather than a perpetrator. (Tr. at 183:12-24, 214:2-7). Consequently, DBNTC has failed to establish sufficient evidence of plaintiff's intent to defraud, particularly with respect to the subject mortgage. Its fraudulent transfer claim cannot succeed. Furthermore, given the core finding that Lois breached her contract with DBNTC, any relief for the allegedly fraudulent transfer would be duplicative.

Playing out the string, DBNTC may not prevail on its demand for a declaratory judgment in the teeth of the actual coercive relief awarded. A declaratory judgment action "cannot be maintained [when] it parallels the other claims and merely seeks a declaration of the same rights and obligations." *Campione v. Campione*, 942 F. Supp. 2d 279, 285 (E.D.N.Y. 2013) (citations

omitted); *accord Smith v. Metro. Prop. & Liab. Ins. Co.*, 629 F.2d 757, 760 (2d Cir. 1980) (citing *Necchi S.p.A. v. Necchi Sewing Machs. Sales Corp.*, 348 F.2d 693, 696 (2d Cir. 1965)).[4] The Court's holding on the breach of contract claim, of course, "necessarily entail[s] a finding by this Court," *Campione*, 942 F. Supp. 2d at 285, that Sacks breached the contract, which is precisely the declaration that DBNTC sought, (Answer ¶ 32). Because DBNTC's "declaratory judgment claim seeks resolution of legal issues that [were], of necessity, resolved in the course of the litigation of the other causes of action . . . the claim is duplicative in that it seeks no relief that is not implicitly sought in the other causes of action." *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006). As a result, DBNTC is not entitled to a declaratory judgment.

III. Third-Party Claims

DBNTC impleaded Robert Sacks, alleging fraud and breach of contract. Because the Court concludes that Lois Sacks authorized the power of attorney and thereby empowered Robert Sacks to execute a mortgage on the Becky's Path Property, the third-party claims may not succeed. That conclusion is compelled by controlling New York law, which provides that a claim of common law fraud will be established if a plaintiff can prove "(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely on it, (3) justifiable reliance of the other party on the

---

[4] Although "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate," Fed. R. Civ. P. 57, Second Circuit precedent clearly allows a district court to decline to hear a declaratory judgment claim when a duplicative claim has also been brought. Courts may sustain the declaratory judgment claim when, for example, the declaratory judgment is necessary to prevent future multiplicitous litigation, *see, e.g.*, *Pateley Assocs. I, LLC v. Pitney Bowes, Inc.*, 704 F. Supp. 2d 140, 151-52 (D. Conn. 2010), but there is no indication that such litigation would follow here.

misrepresentation or material omission, and (4) injury." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996)).

In pursuit of this goal, DBNTC alleges that Robert Sacks misrepresented that he possessed a valid power of attorney permitting him to execute the mortgage on Lois Sacks's behalf. As DBNTC admits, this claim could have succeeded only if the Court had found that the power of attorney was forged. Just the opposite obtained: a validation of the POA. In line with that finding, then, DBNTC cannot establish the first element of fraud. Consequently, judgment for Robert on the claim of common law fraud is warranted. For the same reason, DBNTC's third party claim for breach of contract fails. This claim was brought only on the "[a]ssum[ption] that the Court [would] find that the power of attorney was a forgery," (Def.'s Proposed Findings of Fact & Conclusions of Law ¶ 86, ECF No. 114), but it did not do so. Additionally, having signed the contract on Lois's behalf solely pursuant to a valid POA, Robert was not himself a party to the contract. *See Artists Rights Enf't Corp. v. Estate of Robinson*, No. 15 Civ. 9878 (ER), 2017 WL 933106, at *5 (S.D.N.Y. Mar. 8, 2017) (first citing *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008); and then quoting *Colonial Sec., Inc. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 461 F. Supp. 1159, 1165 (S.D.N.Y. 1978)). Therefore, judgment is for Robert Sacks on this claim.

## Conclusion

Following trial to the Court (Wexler, J., sitting without a jury) and upon the foregoing findings of fact and conclusions of law, judgment on all claims asserted by plaintiff Lois Sacks is for defendants. Judgment on DBNTC's counterclaim for breach of contract is for DBNTC in the amount of $1,690,703.59, comprising contract obligations in the amount of $1,216,304.09 and

attorney's fees in the amount of $474,399.50. DBNTC's other counterclaims are deemed discontinued. Judgment on DBNTC's third party claims against Robert Sacks is for Robert Sacks.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated: Brooklyn, New York
       April 1, 2019

                                              /s/ USDJ ERIC N. VITALIANO
                                              ERIC N. VITALIANO
                                              United States District Judge